2025 UT App 35

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
SHAWN MICHAEL SMITH,
Appellant.

Opinion
No. 20220135-CA
Filed March 6, 2025

Fifth District Court, Cedar City Department
The Honorable Matthew L. Bell
No. 201500605

Benjamin Miller and Debra M. Nelson,
Attorneys for Appellant

Derek E. Brown and Jeffrey D. Mann,
Attorneys for Appellee

JUDGE JOHN D. LUTHY authored this Opinion, in which
JUDGES DAVID N. MORTENSEN and RYAN D. TENNEY concurred.

LUTHY, Judge:

¶1 In 2003, thirteen-year-old Maddison[1] reported to police that Shawn Michael Smith, the husband of her friend's sister, had raped her. After processing Maddison's cervical swabs for DNA and misinterpreting the results as exonerating Smith, the State declined to prosecute the case. In reality, the results indicated not that Smith's DNA failed to match a profile generated from sperm found on the swabs, but that the sperm fraction was too small to generate any DNA profile with the technology available at the time. In 2018, however, the swabs were sent to another laboratory, which was able to generate a DNA profile therefrom. This profile

---

1. A pseudonym.

matched a profile generated from a sample of Smith's blood. Smith was then charged with and later convicted of rape.

¶2    Smith appeals, arguing that the district court erred by denying his motion to dismiss based on the destruction of certain evidence in the years between when the State initially declined to prosecute and when it later charged him. Smith also claims that his trial counsel (Counsel) provided ineffective assistance by (1) not objecting to testimony regarding a DNA match between Smith's blood and sperm found on Maddison's cervical swabs because the State's failure to present the witness who developed the DNA profile from Smith's blood violated the Confrontation Clause, (2) not objecting to the testimony comparing the two DNA profiles because of a lack of foundation, (3) not objecting to testimony by an analyst that she "found very little of his DNA" in 2003, (4) not objecting when the court failed to instruct the jury at the beginning of trial about the presumption of innocence and burden of proof, (5) not objecting to a comment by the State in closing argument that the presumption of innocence was "gone," and (6) not filing a motion to suppress a pocketknife found on Smith because the search that produced the knife violated the Fourth Amendment. Finally, Smith contends that when accumulated, these various alleged errors prejudiced him. None of Smith's claims are availing, so we affirm his conviction.

BACKGROUND[2]

*The Assault*

¶3    In June 2003, thirteen-year-old Maddison was staying at a friend's apartment. Among the people living in the apartment

---

2. "On appeal, we review the record facts in a light most favorable to the jury's verdict and recite the facts accordingly. We present conflicting evidence only as necessary to understand issues raised

(continued…)

were the friend's older sister and her husband, Smith. One day, Maddison went to a gym with her friend, the friend's sister, and Smith. After Maddison was informed that without a parent's permission she could not use the equipment, Smith offered to drop her back off at the apartment. When they arrived, Maddison called another friend (Scott[3]) to come over and hang out until the others returned from the gym. Maddison then went to the bathroom to get ready for Scott to arrive. Meanwhile, Maddison saw, through the reflection in the bathroom mirror, Smith lock the door to the apartment.

¶4 Smith then came to the bathroom and "started to rub up against [Maddison] and mak[e] comments about how [they] should have sex." Maddison felt very uncomfortable and told him no. She reminded him that she was only thirteen, that he was married to her friend's sister, and that Scott was on his way over. But Smith "kept rubbing up against [her] and persisting [in saying they] should have sex." When Maddison walked out of the bathroom, Smith "pushed [her] up against the wall" and, with one hand, "put a knife to [her] throat," while putting his other hand over her mouth and asking, "What if I make you?" There was knocking at the door—Maddison believed it was Scott—but Smith kept the knife to Maddison's throat. Maddison was crying and repeatedly told Smith, "No, please, please don't kill me. Please, please, please don't kill me." Finally, because she was "so scared," she said "okay," and Smith pulled her into the back bedroom.

¶5 Smith then undressed himself and Maddison. He lay down on a mattress on the floor and put his penis in Maddison's mouth. Then he directed Maddison to lie down, after which he penetrated

---

on appeal." *State v. Thomas*, 2019 UT App 177, n.1, 474 P.3d 470 (cleaned up).

3. A pseudonym.

her vaginally. After Smith finished, he took Maddison into the bathroom and instructed her to stand over the toilet while he repeatedly squeezed into her vagina soap and water he had mixed in a baby oil bottle. He then told Maddison not to tell anyone what had happened and climbed out the back window of the apartment.

¶6      After Smith left, Maddison went to the front door, where Scott was waiting and had been knocking intermittently throughout the assault. Maddison was "crying hysterically" while she told Scott that Smith had "just raped [her] and that he had [held] a knife up to [her] throat and . . . douched . . . [her] with the baby oil bottle." Scott stayed with Maddison "[u]ntil nightfall." Later that evening, Maddison left the apartment with a different friend and stayed with her overnight. The next day, after Maddison told that friend what had happened, the friend took her to an emergency room. Hospital staff completed a rape kit, including by taking swabs of Maddison's vagina and cervix.

*The Investigation*

¶7      Police were alerted, and a detective (Detective) began an investigation. Detective interviewed Maddison after the medical examination. Maddison recounted the events described above and also told Detective that the knife Smith had used was a "pocket type knife with a blade length of more than two inches" that was "possibly red."

¶8      The following day, Detective interviewed Scott. Detective's report indicated that Scott recounted that he had come over after Maddison called and that after Maddison did not answer the door, Scott went to the parking lot and saw Smith coming out from behind the apartment. Scott reported that Smith gave him a funny look and did not respond when Scott asked, "[W]hat's up?"

¶9      Detective's report from the day he interviewed Scott indicated that Detective spoke with the prosecutor after that

interview and that the prosecutor "stated that he wanted an interview [with Smith] before a decision to arrest was made." Detective's report indicated that this decision to interview Smith was "based partially on the delay of reporting and the lack of evidence at [that] time."

¶10    Detective tried to contact Smith several times but was unable to make contact until five days after the assault. Detective went to Smith's mother's home and found Smith there, and Smith agreed to meet Detective at Detective's office shortly thereafter. When Smith arrived at Detective's office, Detective searched Smith. During the search, he found a "black Gerber folding knife" in Smith's pants pocket.

¶11    Detective informed Smith of his *Miranda* rights, and Smith "signed a waiver indicating he would speak with [Detective] without an attorney present." Detective asked Smith about Maddison's allegations, and Smith denied having sex with Maddison. "He claimed that she was mad at him because earlier in the week or maybe even two weeks earlier they had been to a party and [Maddison] was there with some older guys" and Smith had told the men Maddison's age. Detective told Smith that the rape kit would be sent to the crime lab for DNA testing and asked Smith if his DNA would be present. Smith "said there's no way, that he hadn't done anything, and that it wouldn't be present." Smith said he was willing to provide a DNA sample. Two months later, Detective asked Smith to provide a DNA sample, and Smith consented to a blood draw.

¶12    After Detective's initial interview of Smith, Detective and another officer searched the apartment where the rape had

occurred for the baby oil bottle Maddison referred to, but they did not find any such bottle.[4]

¶13   Four months after the assault, after the DNA and blood samples were processed, Detective was informed that the lab report was complete. He recorded in his police report, "I have been told that there is no DNA present of the suspect[], only the victim." A week later, Detective received the DNA report. The report indicated that a small amount of sperm was found in the DNA sample on the cervical swab. Specifically, it indicated that "[n]o DNA profile was developed on sample Q1S"—the "sperm fraction" obtained from the DNA on the cervical swab. This was because the sample of sperm was too small for the technology available at the time to obtain a DNA profile from it. But Detective misunderstood the report. He recorded, "It indicates that the blood standard from . . . Smith does not match the sample marked Q1E and could not have originated from the same donor." While this was true, Q1E was the portion of the DNA from the cervical swab that was female DNA, and this DNA was matched with Maddison.

¶14   In other words, Detective misunderstood the report to be saying that the *sperm fraction* did not match Smith, when in fact it said that the *female DNA sample* did not match Smith. Again, there was no male DNA profile generated from the small sample of sperm, so the lab could not have determined whether Smith was a match or not.

¶15   Two months after this, the prosecutor assigned to the case asked Detective to interview Scott a second time. After several failed attempts to contact Scott, law enforcement was able to finally interview him. Detective reported on December 23, 2003,

---

4. Maddison later testified that after Smith douched her with the baby oil bottle, he put it into his pocket, before leaving the apartment through the back window.

that "[t]he second interview of [Scott had] been done and [had] been sent to" the prosecutor.

¶16    On January 29, 2004, Detective noted that he had spoken with the prosecutor, who said he "was going to decline to prosecute this case." Detective later testified that the reason the county attorney's office declined to prosecute was the mistaken belief that the lab results had indicated that Smith's DNA did not match the sperm.

*The 2018 and 2019 Lab Results*

¶17    In 2018, the Utah State Crime Lab sent Maddison's cervical swabs and her blood sample to Bode Cellmark Forensics (Bode), which has a contract to work on the State Crime Lab's "backlog cases." Based on "advancements in technology and DNA profiling," Bode was able to generate a DNA profile for the sperm fraction identified in this case despite the State Crime Lab having not been able to do so in 2003. The DNA profile was entered into the Combined DNA Index System (CODIS) to search for a match.

¶18    In March 2019, the State filed a report indicating that a DNA extraction had been performed on a sample of Smith's blood and a DNA profile had been derived. That report indicated that a forensic scientist at the State Crime Lab (Scientist) had compared this DNA profile with the profile generated by Bode from the sperm fraction. Scientist determined that the two profiles matched, and she indicated that the frequency of this match occurring "in a random population" was estimated at one in "5.4 quadrillion Caucasians," "3.4 quadrillion African Americans," or "19 Quadrillion Southwestern Hispanics." Smith, a Caucasian, was then charged with rape based on the incident that occurred in June 2003.

*Smith's Pretrial Motion to Dismiss*

¶19    During the pretrial stage, it became clear that some—but not all—of the evidence that law enforcement had collected in 2003 had since been destroyed. While local law enforcement had not destroyed the forensic evidence or Detective's report, it had destroyed the audio recordings of interviews with Maddison, Smith, and Scott, as well as a copy of the county prosecutor's letter declining to prosecute the case. The State informed the court that "[i]t seem[ed] these items were disposed of as the case was closed and had been declined by the prosecutors of that time." The applicable police department records retention policy was that felony investigation case files were to be "[r]etain[ed] for 5 years after [the] case closed and then destroy[ed]."

¶20    Based on the missing evidence, Smith asked the court to dismiss the case under *Brady v. Maryland*, 373 U.S. 83 (1963), arguing that the State had "withheld" evidence and that while "[t]he absence of the [evidence made] it impossible to know how detrimental those statements may or may not have been to Mr. Smith's defense," "the presumption should be" that the loss of the evidence prejudiced Smith. The State responded that these circumstances should not be analyzed under *Brady* but, rather, under *State v. Tiedemann*, 2007 UT 49, 162 P.3d 1106, which addresses evidence that is lost or destroyed.

¶21    The court agreed with the State, saying, "There's no indication the State has failed to disclose information, that they've held things back. This is clearly a failure to preserve evidence issue[,] which falls squarely within *Tiedemann*." The court then ruled that Smith had failed to satisfy the threshold requirement in *Tiedemann* that he "demonstrate a reasonable probability that the lost evidence would have been exculpatory." The court also addressed the balancing test provided in *Tiedemann* between "the culpability of the State in the failure to preserve the evidence and the prejudice to the [d]efendant." It found that the State's

culpability here was minimal because there was no evidence that the destruction "was done in bad faith" and, rather, that "[i]t was done in compliance with the retention policy." The court specifically "disagree[d] that the fact that not all evidence was destroyed . . . means there's bad faith," saying, "It is not uncommon for things like DNA samples to be preserved . . . recognizing technology can advance . . . ." The court ultimately determined that "the strength of the remaining evidence [was] profound," concluded that the weighing test fell in the State's favor, and denied the motion.

### *The Jury Selection Process, Preliminary Instructions, and Defense's Opening Statement*

¶22    A jury trial was held in December 2021. During the voir dire process on the first day of the trial, before having the Information read, the court stated to the first group of prospective jurors, "The Information is only an accusation against the Defendant, nothing more. It is not evidence. It is not proof of any guilt." After the Information was read, the court repeated, "I'm going to state it again. The Information is not evidence. It is not proof of guilt, and the Defendant is presumed innocent." To the second and third groups of prospective jurors, the court made essentially the same statements before and after having the Information read to them.

¶23    The court further stated to the prospective jurors:

> The law also provides that when a Defendant enters a plea of not guilty as has been done here, that the Defendant is presumed innocent unless the State proves his guilt beyond a reasonable doubt and if the State fails to meet that burden the jury must find the Defendant not guilty. If any of you would have any hesitancy in applying these legal principles in jury deliberations please raise your hand.

No hands were raised.

¶24 After the jurors were selected and sworn in, the court read the first seven jury instructions to the jury. Instruction 1 included the statements "[y]ou will be given additional instructions later in this case," "[t]he order in which these instructions are given has no significance as to their relative importance," "you should not single out any instruction or ignore any instruction," and "[c]onsider the instructions as a whole."

¶25 Instruction 2 stated, in relevant part:

The Defendant has been charged with the commission of a crime in a formal document called an Information. The clerk has read to you the Information in this case and has told you that the Defendant has pled not guilty to the charge in the Information. In this trial, as in every trial of criminal charges, there's a disagreement about whether the Defendant has committed a crime. It is your duty in this trial to decide the issues of fact presented by the charges in the Information and the Defendant's plea of not guilty to the charges. You may not consider the filing of the Information, the Defendant's not guilty plea, or the fact that the Defendant has been brought before the court for trial to be evidence of the Defendant's guilt or innocence.

¶26 In the defense's opening statement, Counsel emphasized the State's burden and the presumption of innocence, saying:

It is the State's responsibility to prove each element of the crime alleged beyond a reasonable doubt. The Judge will give you instructions as we continue through to tell you what your responsibility is. And it's the State's burden to prove beyond a reasonable doubt that the crime was committed. The Defense

has no burden. The burden cannot be shifted. It is up to the State to prove each element beyond a reasonable doubt to satisfy you that what has been alleged to have happened has happened. As we proceed through the course of trial it is your duty to presume that Mr. Smith is innocent until a verdict of something different comes forth or you decide that the verdict should be not guilty.

*The Evidence at Trial*

¶27    During the State's case, Maddison, Scott, and Detective testified, recounting the rape and the investigation as described above. The State also called the doctor who examined Maddison at the hospital, an officer who drew Smith's blood, and four forensic scientists, including Scientist.

¶28    One of the forensic scientists (Analyst) had created the lab report in 2003, and she testified about that report. Analyst described the process she used to separate the male and female cells collected on Maddison's cervical swabs. She said that "[i]n this case," the female sample "had a large amount of DNA" and the sperm fraction "had a very small amount of DNA." She then stated, "[B]ased on the fact that I found very little of his DNA and lots of hers, I did a procedure to optimize how much DNA I took on." She also testified that Maddison matched Q1E—the female sample—and that Smith did not match that female sample. This was Analyst's only direct reference to Smith, apart from her identifying Maddison and Smith as the individuals involved in the samples sent to her, which included blood samples from both individuals. Analyst further testified that "there was no DNA profile that was developed for Q1S or the sperm fraction of the cervical swabs." In response to being asked why she could not "get a profile from the sperm," she said she could not do so "[b]ecause there was a very, very small amount of DNA and it did

not meet the requirements of the kit that [she] used to make the copies of the DNA."

¶29 Another analyst (Bode Analyst) testified about her role at Bode in generating a profile of male DNA from cervical swabs from Maddison. She stated that Bode received cervical swabs and a blood sample from Maddison but that Bode did not receive a blood sample from Smith or anything else known to contain his DNA. Bode Analyst described how she used Maddison's DNA to isolate the DNA belonging to the other contributor to the sample on the cervical swabs. She generated a report identifying the profile for this male DNA.

¶30 Scientist testified that in 2018, a DNA profile was able to be generated from the sperm fraction, even though that had not been accomplished in 2003, because the kits today "are just a lot more sensitive than the kits that were used in 2003" and, accordingly, analysts today are "able to develop a full DNA profile from a lot less starting sample." She testified that her "role in this case" was to compare "the standard that was submitted for . . . Smith to the previously developed foreign profile [that was] reported out by Bode." She acknowledged that she "personally did not do the lab work" to develop Smith's DNA profile, but she testified that the DNA profile ascribed to Smith "was generated from a [blood] sample that we know came from [Smith]." After discussing advancements in technology since 2003, Scientist then confirmed that when she compared the DNA profile provided by Bode with the DNA profile "from [Smith's] blood sample," they were "consistent." She then gave a "weight to that consistency" by providing the probabilities related above, *see supra* ¶ 18.

¶31 The defense called two witnesses. First was Maddison's friend who lived in the apartment where the assault had taken place. She testified that on the day of the assault Smith was gone from the gym for "less than twenty minutes" and that it took "[a]bout ten minutes" to get from the apartment to the gym. She

also said that from her recollection it was not possible to see the front door in the mirror in the apartment's bathroom. The second was a private investigator, who described the layout of the apartment and agreed that the front door was not visible in the bathroom's mirror.

*The Jury Instructions, State's Closing Argument, and Conviction*

¶32 Before closing arguments, the court read to the jury the instructions it had not read at the beginning of the trial, including Instruction 8, which correctly instructed the jury as to the presumption of innocence and burden of proof.

¶33 In closing arguments, the State said, among other things, the following:

> I want to talk about Jury Instruction No. 8 now. . . . [I]t talks about reasonable doubt. And it's a wonderful system that we have[.] [W]hen you're a defendant you have a presumption of innocence when you walk in on the first day of your trial and that is a guarantee by the United States [Constitution]. Ladies and gentlemen, that shroud that the defendant was clothed in that he was presumed innocent when he came here, it's gone. It's gone. We've proven each element beyond a reasonable doubt that he's guilty of rape.
>
> I want to read from Jury Instruction No. 8 for a moment. "Proof beyond a reasonable doubt is proof that leaves you firmly convinced of the defendant's guilt." There are very few things in the world that we know with absolute certainty. And in the criminal case the law doesn't require proof to overcome every possible doubt.

> If based on your consideration of the evidence, you are firmly convinced that the defendant is guilty of the crime charged you must find him guilty.
>
> If, on the other hand, you think that there's a real possibility that he's not guilty, you give him the benefit of the doubt.

¶34 For his part, Counsel began his closing argument by also reading from Instruction 8 regarding the presumption of innocence. He then explained, "Smith is still innocent as he sits here today. The presumption of innocence benefits the defendant throughout the trial unless the [State] meets [its] burden."

¶35 Ultimately, the jury convicted Smith of rape, and Smith now appeals.

ISSUES AND STANDARDS OF REVIEW

¶36 Smith presents eight issues for review. First, he asserts that the district court erred by denying his motion to dismiss based on the destruction of some evidence between 2003 and 2019. "Whether the State's destruction of potentially exculpatory evidence violates due process is a question of law that we review for correctness. However, because this question requires application of facts in the record to the due process standard, we incorporate a clearly erroneous standard for the necessary subsidiary factual determinations." *State v. Tiedemann*, 2007 UT 49, ¶ 12, 162 P.3d 1106 (cleaned up).

¶37 Smith next raises six ineffective assistance of counsel claims. Smith argues that Counsel was ineffective for (1) not objecting to Scientist's testimony regarding a match between a DNA profile created from sperm found on Maddison's cervical swabs and a DNA profile created from Smith's blood because the

State's failure to present the witness who developed the DNA profile purportedly from Smith's blood violated Smith's rights under the Confrontation Clause, (2) not objecting to Scientist's testimony comparing the two DNA profiles because of a lack of foundation for the testimony, (3) not objecting to testimony by Analyst that she "found very little of his DNA" in 2003, (4) not objecting when the court failed to instruct the jury at the beginning of trial about the presumption of innocence and burden of proof, (5) not objecting to a comment by the State in closing argument that the presumption of innocence was "gone," and (6) not filing a motion to suppress a pocketknife found on Smith because the search that produced the knife violated the Fourth Amendment. "When a claim of ineffective assistance of counsel is raised for the first time on appeal, there is no lower court ruling to review and we must decide whether the defendant was deprived of the effective assistance of counsel as a matter of law." *State v. Guerro*, 2021 UT App 136, ¶ 25, 502 P.3d 338 (cleaned up).

¶38   Finally, Smith contends that when accumulated, the various alleged errors prejudiced him. "Under the cumulative error doctrine, we apply the standard of review applicable to each underlying claim of error. And we will reverse only if the cumulative effect of the several errors undermines our confidence that a fair trial was had." *State v. McNeil*, 2013 UT App 134, ¶ 16, 302 P.3d 844 (cleaned up), *aff'd*, 2016 UT 3, 365 P.3d 699.

ANALYSIS

I. Smith's Motion to Dismiss

¶39   In the years before the DNA evidence in this case was reexamined, other evidence obtained in the investigation was destroyed. Smith maintains that several items that were destroyed are material: the initial forensic report, evidence of a second interview with Scott, and recordings of other interviews. Smith asserts that the district court erred by denying his motion to

dismiss this case on the ground that the destruction of the foregoing evidence violated his due process rights as guaranteed by the Utah Constitution. *See generally* Utah Const. art. 1, § 7 ("No person shall be deprived of life, liberty or property, without due process of law.").

¶40    In *State v. Tiedemann*, 2007 UT 49, 162 P.3d 1106, our supreme court declared:

> In cases where a defendant has shown a reasonable probability that lost or destroyed evidence would be exculpatory, we find it necessary to require consideration of the following: (1) the reason for the destruction or loss of the evidence, including the degree of negligence or culpability on the part of the State; and (2) the degree of prejudice to the defendant in light of the materiality and importance of the missing evidence in the context of the case as a whole, including the strength of the remaining evidence.

*Id.* ¶ 44. The court later confirmed, in *State v. DeJesus*, 2017 UT 22, 395 P.3d 111, that *Tiedemann* "established a two-step analysis," holding that before engaging in the foregoing balancing test, "the defendant must demonstrate a reasonable probability that the lost evidence would have been exculpatory—the threshold requirement." *Id.* ¶ 27. "Only after the defendant has established [a threshold reasonable probability that lost or destroyed evidence is exculpatory] should a court consider the two *Tiedemann* factors." *Id.* ¶ 29.

¶41    In a separate case, the court explained this threshold requirement in more detail:

> Although a "reasonable probability" is difficult to define, we have provided some guidelines: A reasonable probability is a probability sufficient to

undermine confidence in the outcome. It is above a mere possibility, though it may fall substantially short of the more probable than not standard. . . . But even though the bar is low, there must be more than speculation . . . .

*State v. Mohamud*, 2017 UT 23, ¶ 20, 395 P.3d 133 (cleaned up).

¶42 Smith argues that he has satisfied this threshold requirement, asserting that the evidence that was destroyed—particularly the recordings of interviews with Maddison, Smith, and Scott[5]—was likely exculpatory. Smith focuses much attention on Detective's second interview with Scott, which we address below. First, however, we consider his other assertions as to the likelihood of the destroyed evidence being exculpatory.

¶43 Smith asserts that "the destroyed interviews of [Maddison] and [Scott] likely would have contained inconsistencies and impossibilities that could have been used as valuable

---

5. Smith also asserts that "the State destroyed the initial report from the forensic testing that showed no connection to Mr. Smith" and that this report "was incontrovertibly exculpatory." However, the 2003 forensic testing report was admitted at trial. Smith seems to argue that this report was not the one that was destroyed, saying, "The lone retained police report indicated that Mr. Smith's DNA 'does not match' the sample and it 'could not have originated' from him," but "[t]he evidence at trial was that initially no DNA had been found to try to make a match," so "[w]hether the police made a mistake or were operating from a different, since destroyed, report, is not known." But, as explained above, Detective's record entry reflected a misinterpretation of the 2003 report, and Detective testified to this misunderstanding at trial. Accordingly, we are not convinced that a separate 2003 forensic report existed and was destroyed.

impeachment." This assertion fails to satisfy the threshold requirement. Our supreme court has explained that

> to establish a reasonable probability that video evidence is exculpatory for impeachment purposes, a defendant cannot rest on the claim that the evidence could have undermined confidence in a witness's testimony *in some possible way*, but must instead make some proffer as to what testimony would have been contradicted and how such a contradiction would have aided the defendant.

*Id.* ¶ 22 (emphasis added) (cleaned up). For example, our supreme court has specifically indicated that a defendant's "speculation that [destroyed] video evidence could have impeached [police] officers' testimony in some unspecified way [was] insufficient to satisfy the reasonable probability threshold set forth in *Tiedemann* and *DeJesus*." *Id.* The same is true here. Smith's assertion that the missing evidence would serve some unknown impeachment function is not sufficient.

¶44 Smith further argues that the destruction of only some of the evidence initially collected establishes a reasonable probability that the destroyed evidence was exculpatory. He says that "[l]aw enforcement's decision to keep some evidence and destroy the rest is another piece of circumstantial evidence that the destroyed evidence contained exculpatory information" and that because "a decision was made to keep the forensic material, the knife, and a single police report, but destroy everything else, an adverse inference against the State is appropriate that the destroyed evidence would have been harmful to its case." We disagree. While it is conceivable that there may be a circumstance where the destruction of some evidence and retention of other evidence might support an inference that the destroyed evidence was exculpatory, we believe that no such inference is justified here. Nothing beyond Smith's speculation suggests that in this

case the State selectively destroyed evidence that was exculpatory. And Smith does not claim on appeal that the district court's factual findings on this point were unsupported by substantial evidence, so we accept as true the court's finding that "[t]here's no evidence that [the destruction] was done in bad faith" and, rather, that "[i]t was done in compliance with the retention policy." Given that the retention policy supported the destruction of evidence after five years, the decision to destroy any particular piece of evidence does not support an inference that the destroyed evidence was exculpatory.

¶45 Next, we consider Smith's argument concerning Scott's second interview. Here, Smith argues:

> It is not "pure speculation" to believe that whatever was said in that second interview would have contained exculpatory evidence. Given the circumstances, it is highly likely that something was said—or not said—in that interview that undermined [Maddison's] allegations, undermined her credibility, and supported Mr. Smith's stance that he was not guilty. The defense does not need to know precisely what was said to be able to rely on the relevant, reasonable circumstances to make its case.

Smith's reference to "the circumstances" concerns the timing of the second interview of Scott related to the decision not to prosecute the case, which Smith believes indicates that the second interview contained exculpatory evidence. As he puts it in his brief:

> The State argued that the decision not to arrest was because of the initial results of forensic testing. But that is not what the timeline establishes. The police did not decline the case after getting the DNA results. Police only stopped after their second

conversation with [Scott]—an interview they later destroyed. The police had the forensic results in the Fall of 2003; they reinterviewed [Scott] in December after he repeatedly dodged their calls; and in early January 2004, they declined to proceed.

¶46　While Smith is correct that the prosecutor made the ultimate decision not to prosecute the case after the second interview with Scott, we are not convinced that Smith's contention that that interview contained exculpatory evidence goes beyond speculation. This is because the record supports a different conclusion about the import of this interview.

¶47　Detective's report on the day of Scott's first interview with Detective indicates that Detective spoke with the prosecutor after interviewing Scott. Detective reported that the prosecutor "stated that he wanted an interview [with Smith] before a decision to arrest was made." Detective indicated that this decision was "based partially on the delay of reporting and the lack of evidence at [that] time." This is critical because it shows that even with Scott's first interview—which described him repeatedly knocking at the door, him seeing Smith come around from behind the apartment and give him a funny look, and Maddison finally opening the door, being upset, and telling Scott that she had been raped—the State felt it did not have enough evidence to arrest and charge Smith at that time.

¶48　After this point, Detective interviewed Smith, uncovering the pocketknife but also hearing Smith adamantly deny any wrongdoing and insist that he would cooperate. Detective then searched the bathroom of the apartment where the rape allegedly took place and found no baby oil bottle. Later, the State received the initial DNA results, which Detective misinterpreted as precluding a match with Smith. Importantly, the State did not then arrest or charge Smith, suggesting that it did not believe it had sufficient evidence to prosecute him at that time.

¶49  Only some weeks later did the prosecutor ask Detective to reinterview Scott, and within two weeks, a report of Detective's second interview of Scott was sent to the prosecutor. Over a month after that, the prosecutor informed Detective that he was declining to prosecute the case.

¶50  Based on the foregoing investigative timeline, there is no reason to believe that the second interview of Scott was exculpatory. Smith points to nothing other than the timing of Scott's second interview and the prosecutor's ultimate decision not to prosecute as the basis for us to assume that Scott's second interview yielded exculpatory evidence. Yet it is at least as likely that this interview simply yielded no additional information and, thus, that the State felt the same way after the interview as it did before—that it lacked sufficient evidence to prosecute Smith. In other words, the investigative timeline is decidedly inconclusive, thus supporting only a speculation as to whether the second interview of Scott contained exculpatory information.

¶51  Because Smith cannot satisfy the threshold requirement set forth in *Tiedemann*, we have no need to engage in the balancing test given therein. The district court did not err in denying Smith's motion to dismiss on due process grounds.

## II. Ineffective Assistance of Counsel

¶52  Smith asserts six claims of ineffective assistance of counsel. To demonstrate ineffective assistance of counsel, an appellant must satisfy both prongs of the test articulated in *Strickland v. Washington*, 466 U.S. 668 (1984). Under the first prong, "the defendant must show that counsel's performance was deficient" in that it "fell below an objective standard of reasonableness." *Id.* at 687–88. We "afford[] a strong presumption that counsel's actions were within the broad range of conduct considered a sound trial strategy." *State v. Hutchings*, 2012 UT 50, ¶ 18, 285 P.3d 1183 (cleaned up). Under the second prong, "the defendant must show that the deficient performance prejudiced the defense."

*Strickland*, 466 U.S. at 687. This is achieved by showing "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," thereby "undermin[ing] confidence in the outcome." *Id.* at 694. "Because failure to establish either prong of the test is fatal to an ineffective assistance of counsel claim, we are free to address [a defendant's] claims under either prong." *Honie v. State*, 2014 UT 19, ¶ 31, 342 P.3d 182. We now address Smith's six ineffective assistance claims in turn.

A. The Confrontation Clause and Scientist's Testimony

¶53 The Sixth Amendment to the United States Constitution declares that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. "The confrontation guarantee of the Sixth Amendment . . . is to be enforced against the States under the Fourteenth Amendment according to the same standards that protect those personal rights against federal encroachment." *Pointer v. Texas*, 380 U.S. 400, 406 (1965) (cleaned up). Those federal standards dictate that in a criminal trial, when a testimonial statement is admitted for its truth, the defendant must be allowed to cross-examine the declarant unless the declarant is unavailable and the defendant has had a previous opportunity to cross-examine the declarant. *Crawford v. Washington*, 541 U.S. 36, 59 & n.9 (2004).

¶54 In this case, Scientist testified that "another qualified analyst" at the State Crime Lab developed a DNA profile "from a [blood] sample that we know came from [Smith]." Scientist further testified that the DNA profile developed "from [Smith's] blood sample" matched the DNA profile developed by Bode from the sperm fraction derived from the DNA on Maddison's cervical swabs. Smith argues that the Confrontation Clause required that he "be able to confront the analyst who did the work" that resulted in the DNA profile ascribed to him. He asserts that

"[w]ithout testimony from the analysts who created his DNA profile . . . , [he] was unable to meaningfully explore on cross-examination whether the results [Scientist] used were obtained through mistake, incompetence, or fraud." Based on these assertions, Smith further contends that Counsel performed deficiently by not objecting to Scientist's testimony on Confrontation Clause grounds. We need not decide the merits of Smith's Confrontation Clause argument because we determine that, even if Scientist's testimony violated the Confrontation Clause and, therefore, that an objection by Counsel on that ground would have been successful, Counsel did not perform deficiently by not objecting to Scientist's testimony.

¶55 Counsel's decision not to object to Scientist's testimony on Confrontation Clause grounds was not deficient performance because Counsel could have reasonably assumed that such an objection would have likely led to the State calling the expert who prepared the DNA profile developed from Smith's blood to testify to the accuracy of that profile. When analyzing an ineffective assistance claim, we must recognize that defense counsel "knew of materials outside the record." *Harrington v. Richter*, 562 U.S. 86, 105 (2011). And we must proceed on the "strong presumption that counsel's actions were within the broad range of conduct considered a sound trial strategy," *Hutchings*, 2012 UT 50, ¶ 18 (cleaned up), unless material in the record makes counsel's deficient performance "a demonstrable reality," *State v. Munguia*, 2011 UT 5, ¶ 30, 253 P.3d 1082 (cleaned up). Because there is no indication in the record here that Smith could have countered such testimony, we must conclude that Counsel's decision to avoid that potential outcome was reasonable. As the United States Supreme Court has said in a related context,

> It is unlikely that defense counsel will insist on live testimony whose effect will be merely to highlight rather than cast doubt upon the forensic analysis. Nor will defense attorneys want to antagonize the

> judge or jury by wasting their time with the appearance of a witness whose testimony defense counsel does not intend to rebut in any fashion.

*Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 328 (2009) (explaining why the Court's holding that the Confrontation Clause requires in-person testimony from analysts who identify seized substances will not impose an excessive burden on the prosecution of drug crimes). Additionally, by forgoing an objection, Counsel created an opportunity to assert during closing arguments that the State's DNA evidence was flawed. Indeed, that is essentially what Counsel did when he reminded the jury, "[Scientist] just got two [DNA profiles] and she put them in the system and said, this is what it is. . . . [She] didn't analyze any of that. [She] just took what [she] was given and [reported a match]."

¶56 Smith counters by contending that Counsel's failure to object was unreasonable because "[t]he State had no witness available it could have called" to establish the accuracy of the DNA profile developed from Smith's blood. In support of that contention, Smith does not point to any evidence that the analyst who prepared the DNA profile developed from his blood was unavailable to testify. Rather, he cites rule 16 of the Utah Rules of Criminal Procedure, which requires prosecutors to disclose "no later than 14 days, or as soon as practicable, before trial . . . , a written list of the names and current contact information of all persons whom the prosecution intends to call as witnesses at trial." Utah R. Crim. P. 16(a)(5)(A). And he explains that "[n]o expert who the State noticed or who appeared on the witness list was involved in developing the DNA profile [from Smith's blood]." Thus, he asserts, had Counsel objected, "the State would have been unable to present the needed witness."

¶57 But exclusion is not the default sanction for failure to satisfy the notice requirements for expert witnesses in a felony case. Section 77-17-13 of the Utah Code specifically governs expert

witnesses in felony prosecutions. Under that section, if a party "fails to substantially comply" with the disclosure requirements for expert witnesses in a felony case, "the opposing party shall, if necessary to prevent substantial prejudice, be entitled a continuance of the trial . . . sufficient to allow preparation to meet the testimony." Utah Code § 77-17-13(4)(a). "The remedy of exclusion of the expert's testimony will only apply if the court finds that a party deliberately violated the provisions of [section 77-17-13]." *Id.* § 77-17-13(4)(b). And here, Smith asserts no deliberate violation by the prosecution.

¶58   Admittedly, section 77-17-13 "does not apply to the use of an expert who"—like the State Crime Lab analyst who prepared the DNA profile from Smith's blood sample—"is an employee of the [S]tate . . . , so long as the opposing party is on reasonable notice through general discovery that the expert may be called as a witness at trial, and the witness is made available to cooperatively consult with the opposing party upon reasonable notice." *Id.* § 77-17-13(6). In such a case, rule 16 of the Utah Rules of Criminal Procedure—which addresses discovery in criminal cases generally—arguably governs the relief to be provided for the prosecution's failure to include a particular person in its list of witnesses it intends to call at trial.

¶59   However, even if rule 16 would have controlled the relief provided for the prosecution's failure to timely identify the missing analyst in this case (something that Smith has not demonstrated), rule 16 also does not require automatic exclusion of a witness who was not included in the prosecution's list of persons it intends to call at trial. *See* Utah R. Crim. P. 16(e). Rather, "[w]hen a party fails to comply with the disclosure requirements of [rule 16], the court may"—in its discretion (and as relevant here)—"grant a continuance," "prohibit the party from introducing evidence not disclosed," or "order such other relief as the court deems just under the circumstances." *Id.* And Counsel could have reasonably concluded here that even under rule 16, if,

in response to a Confrontation Clause objection, the prosecution had sought to call the analyst who prepared Smith's DNA profile, the district court would not have excluded that testimony.

¶60 The prosecutor was required to "disclose to the defendant" any "report . . . of any scientific test or experiment" that was "directly related to the case of which the prosecution team [had] knowledge and control," *id.* R. 16(a)(1)(B), and Smith does not assert that the prosecutor failed to comply with this duty regarding the DNA profile developed by the State Crime Lab from Smith's blood sample. Nor has Smith shown that the analyst who prepared the DNA profile from Smith's blood sample would have been unavailable to testify if called. Smith also does not assert that a continuance would have been insufficient to allow Counsel to prepare to meet the analyst's testimony. And he does not contend that the court's or counsel's calendars could not have accommodated a reasonable continuance. Given these facts and the discretion given to district courts under rule 16 in crafting appropriate relief for a party's failure to timely identify a witness prior to trial, Counsel could have reasonably concluded that under either section 77-17-13 or rule 16, any objection to Scientist's testimony on Confrontation Clause grounds would not have resulted in the exclusion of the missing analyst's testimony but, instead, at most a continuance to allow Counsel to prepare for that testimony.[6]

¶61 Because Counsel could have reasonably concluded that an objection to Scientist's testimony on Confrontation Clause grounds would have led to the prosecution calling the missing

_____

6. At oral argument, Smith suggested that a continuance would not have been a viable course for the court to take in response to a midtrial objection to Scientist's testimony because, at that point, jeopardy had already attached. But a defendant is "not placed in double jeopardy . . . simply because a [midtrial] continuance [is] granted." *State v. Bradshaw*, 680 P.2d 1036, 1040 (Utah 1984).

analyst to testify, that the court would not have excluded that testimony, and that admission of that testimony would have only hurt Smith's defense, Counsel's decision not to object to Scientist's testimony on Confrontation Clause grounds did not constitute deficient performance. Thus, this ineffective assistance claim fails.

B.     Foundation of Scientist's Testimony

¶62     Smith next asserts that Counsel provided ineffective assistance when he did not also object to a lack of foundation for Scientist's testimony. Smith argues that Counsel should have objected on the ground that "[n]ot presenting the testimony or even a report from the analyst who developed [Smith's DNA] profile" rendered Scientist's "ultimate expert conclusion baseless." Smith claims that without establishing the "foundational facts" that Scientist "based her opinion on"— namely, that Smith's DNA profile was actually and accurately developed from his blood—the State failed to clear the "threshold of reliability," a circumstance that should have precluded admission of Scientist's testimony. However, withholding an objection about the threshold reliability of Scientist's expert testimony was reasonable for the same reasons that withholding an objection on Confrontation Clause grounds was reasonable. Counsel could have reasonably concluded that an objection to Scientist's testimony on foundation grounds would have likewise led to the prosecution calling the missing analyst to lay foundation for Scientist's testimony, that the court would have allowed the foundation testimony, and that the foundation testimony would have only hurt the defense. Accordingly, this ineffective assistance claim fails as well.

C.     Analyst's Testimony About "His DNA"

¶63     Smith contends that Counsel was ineffective for failing to object when Analyst testified that she "found very little of his DNA and lots of hers" when she tested the sample in 2003. Smith

asserts that by this testimony Analyst "told the jury that in 2003 they did find 'very little of [Smith's] DNA.'"

¶64 While it is true that "the State may not knowingly use false evidence to obtain a conviction," *State v. Cruz*, 2020 UT App 157, ¶ 27, 478 P.3d 631 (cleaned up), that is not what happened here. Analyst, who testified regarding the lab report she created in 2003, said that "[i]n this case," the female sample "had a large amount of DNA" and the sperm fraction "had a very small amount of DNA." She then stated that because she "found very little of his DNA and lots of hers," she "did a procedure to optimize" the presence of the DNA. Given this context, Smith's claim that Counsel performed deficiently by not objecting fails. Analyst was talking about male and female DNA. Counsel could have reasonably concluded that by saying "his DNA," Analyst was merely differentiating it from the female DNA also in play. Analyst did not say "Smith's DNA" for a reason, namely, that the identity of the male donor was not established. And Counsel could have reasonably understood this distinction in the context of the testimony and determined there was no reason to object. Smith has therefore failed to demonstrate that Counsel performed deficiently by not objecting to Analyst's reference to "his DNA," and, accordingly, this claim of ineffective assistance fails.[7]

---

7. Even if Analyst's reference to "his DNA" could have been understood to mean "Smith's DNA," Analyst thereafter clearly testified that her testing did not reveal Smith as the source of the sperm. She said that "there was no DNA profile that was developed for Q1S or the sperm fraction of the cervical swabs." And in response to being asked why she could not "get a profile from the sperm," she said it was "[b]ecause there was a very, very small amount of DNA and it did not meet the requirements of the kit that [she] used to make the copies of the DNA." In other words, she told the jury that she could not match Smith—or any other

(continued…)

D.    Jury Instructions on the Presumption of Innocence and Burden of Proof

¶65    Smith next argues that Counsel provided ineffective assistance by not objecting when the district court did not instruct the jury at the beginning of trial about the presumption of innocence and the State's burden of proof. Smith does not assert that the jury instruction on this topic was erroneous but instead asserts that it was given too late. Moreover, Smith says that the district court compounded the problem of late presumption of innocence and burden of proof instructions when, at the outset of trial, it characterized the jury's role as settling a "disagreement" between the two sides.[8] While conceding that a "failure to instruct on the core principles at the outset may not always be error," Smith asserts that when "combined with misstating the nature of a criminal trial," the delayed instructions amounted to a "serious infringement" of his "right to a fair trial" and that it was "ineffective assistance for his attorney not to object."

¶66    It is well settled that "in reviewing the adequacy of jury instructions, we look at the jury instructions in their entirety and will affirm when the instructions taken as a whole fairly instruct

---

male—to the sperm fraction because there was not enough male DNA to generate a profile using the technology available in 2003. Hence, even if the jury had initially understood the reference to "his DNA" as indicating that a small amount of Smith's DNA was present on the swabs, Analyst's own statements thereafter prevented any prejudice from this misunderstanding.

8. Smith's point here appears to be that characterizing the criminal prosecution as a mere "disagreement" between the parties subtly suggested to the jury that the parties are on equal footing, thus undermining the presumption of innocence and the State's obligation to carry its affirmative burden of proving guilt beyond a reasonable doubt.

the jury on the law applicable to the case." *State v. Dominguez*, 2019 UT App 116, ¶ 20, 447 P.3d 1224 (cleaned up); *see also State v. Pence*, 2018 UT App 198, ¶ 30, 437 P.3d 475; *State v. Moore*, 2015 UT App 112, ¶ 4, 349 P.3d 797. "Thus, even if one or more of the instructions, standing alone, are not as full or accurate as they might have been, counsel is not deficient in approving the instructions as long as the trial court's instructions constituted a correct statement of the law." *State v. Lee*, 2014 UT App 4, ¶ 23, 318 P.3d 1164 (cleaned up).

¶67 As to when instructions are to be given, rule 17(f) of the Utah Rules of Criminal Procedure, which outlines the "order" of a criminal trial, states, "When the evidence is concluded and at any other appropriate time, the court *shall* instruct the jury." Utah R. Crim. P. 17(f)(6) (emphasis added). And rule 19 indicates that "[a]fter the jury is sworn and before opening statements, the court *may* instruct the jury concerning the jurors' duties and conduct, the order of proceedings, the elements and burden of proof for the alleged crime, and the definition of terms." *Id.* R. 19(a) (emphasis added). It also explains that "[d]uring the course of the trial, the court *may* instruct the jury on the law if the instruction will assist the jurors in comprehending the case." *Id.* R. 19(b) (emphasis added).

¶68 Given this caselaw and the discretion afforded district courts by our procedural rules regarding the timing of giving instructions, we see no deficient performance on the part of Counsel.

¶69 First, while Smith complains that Instruction 2 did not properly tell the jury about the presumption of innocence and the burden of proof because it stated that "there's a disagreement about whether the Defendant has committed a crime," there is no dispute that Instruction 8 accurately stated the law on the presumption of innocence and the burden of proof. The "disagreement" language might seem a bit soft from a defense

perspective, but a competent attorney could believe that, when viewing the instructions as a whole, this instruction did not undermine or contradict the clear articulation of the presumption of innocence and the burden of proof in Instruction 8.

¶70　Second, our procedural law is clear that instructions may be given after the presentation of the evidence. We—along with the parties—are not aware of any case that requires the presumption of innocence or the burden of proof to be addressed or defined at the beginning of trial. We cannot fault Counsel for not objecting to a practice that was clearly allowed by the Utah Rules of Criminal Procedure and apparently unaddressed in caselaw. Given the lack of legal impetus to support an objection, there is no foundation upon which we might base a conclusion that Counsel performed deficiently by not objecting to the timing of the burden of proof and presumption of innocence instructions. Moreover, Counsel would have had little motive to object for another reason. During voir dire, the court stated the burden of proof and presumption of innocence correctly multiple times. And Counsel reiterated them without objection during his opening statement. Counsel could have reasonably decided that the jury, having been informed of the burden of proof and presumption of innocence during voir dire and opening statements, could wait until the final instructions to hear them again. At the very least, reasonable counsel could have concluded that there was little strategic advantage to be gained through the court repeating the burden of proof and presumption of innocence at the start of trial.[9]

---

9. While our rules and caselaw do not create an obligation to instruct the jury on the presumption of innocence and burden of proof at the beginning of trial, the Model Utah Jury Instructions recommend giving such instructions at both the beginning and the end of trial, *see* MUJI 2d CR 102–04, 208–09,

(continued…)

¶71 Because Counsel did not perform deficiently by not objecting when the court did not instruct the jury at the beginning of trial about the presumption of innocence and the State's burden of proof, this ineffective assistance claim fails.

E.    The State's Closing Argument Comment on the Presumption of Innocence

¶72 Smith next asserts that Counsel provided ineffective assistance by not objecting to the State's comment during closing argument that the presumption of innocence was "gone." In his closing argument, the prosecutor stated:

> [I]t's a wonderful system that we have[.] [W]hen you're a defendant you have a presumption of innocence when you walk in on the first day of your trial and that is a guarantee by the United States [Constitution]. Ladies and gentlemen, that shroud that the defendant was clothed in that he was presumed innocent when he came here, it's gone. It's gone. We've proven each element beyond a reasonable doubt that he's guilty of rape.

Smith asserts that this statement was obviously improper because it incorrectly suggested that the presumption of innocence is overcome when the State presents sufficient evidence of guilt rather than when the jury decides to convict a defendant because it has no reasonable doubt as to the defendant's guilt.

---

https://legacy.utcourts.gov/muji/?cat=2 [https://perma.cc/5KR6-F3S5], and we encourage courts to follow this best practice. Moreover, our supreme court, through its Advisory Committee on the Rules of Criminal Procedure, may wish to consider adopting a rule mandating that certain instructions pertaining to the presumption of innocence and burden of proof be given prior to opening statements or before the presentation of evidence.

Accordingly, Smith argues that Counsel needed to object to the statement and that failing to object harmed Smith.

¶73    "When we review an attorney's failure to object to a prosecutor's statements during closing argument, the question is not whether the prosecutor's comments were proper, but *whether they were so improper* that counsel's only defensible choice was to interrupt those comments with an objection." *State v. Houston*, 2015 UT 40, ¶ 76, 353 P.3d 55 (cleaned up). In many instances, defense counsel enjoys "the prerogative . . . to swallow their tongue instead of making an objection." *State v. Hummel*, 2017 UT 19, ¶ 110, 393 P.3d 314. The "many legitimate, strategic reasons why an attorney might choose to not object to a statement made during closing argument" include

> the possible fear that objecting [will] call attention to the improper statements and suggest to the jury that they were damaging when counsel felt they were not, the concern that the jury [is] weary and inattentive to the prosecutor and that objecting [will] only serve to focus [its] attention on the remark, and the concern that an objection [will] create antipathy to the defense if the jury perceive[s] that counsel's repeated objections [are] only prolonging the proceedings.

*State v. Harris*, 2024 UT App 191, ¶ 21, 562 P.3d 1215 (cleaned up), *cert. denied*, Feb. 25, 2025 (No. 20250077). Another instance where defense counsel is not obligated to object is when "uncertainties in the law" make it "far from certain" that the objection will succeed, because in that circumstance, counsel can reasonably believe that "the court might deny the objection" and thereby "give some appearance of judicial approval or official imprimatur to the prosecutor's comments." *Id.* ¶ 31 (cleaned up).

¶74    Here, as noted, the prosecutor's arguably objectionable comment was that by the time of closing arguments, the

presumption of innocence that Smith "was clothed in" "on the first day of [his] trial" was "gone." We recognize that by this comment, the prosecutor may very well not have meant that Smith's presumption of innocence was "gone" even without the jury's input but, rather, that the State had done its job of proving each element of the crime beyond a reasonable doubt. In fact, immediately after saying that the presumption of innocence was "gone," that is exactly what Counsel argued: "We've proven each element beyond a reasonable doubt that he's guilty of rape." Nevertheless, the prosecutor was treading on thin ice.

¶75   As we recently noted in *State v. Harris*, 2024 UT App 191, 562 P.3d 1215, *cert. denied*, Feb. 25, 2025 (No. 20250077)—a case that also involved the prosecutor arguing in closing that the presumption of innocence was by that point "gone"—"[b]oth the Utah Supreme Court and this court have previously said in passing that the presumption of innocence applies until the defendant has been *convicted*," *id.* ¶¶ 22, 25 (citing *Price v. Turner*, 502 P.2d 121, 122 (Utah 1972); *Stewart v. State*, 830 P.2d 306, 308 (Utah Ct. App. 1992)), and "the United States Supreme Court has likewise said that the presumption applies 'throughout the trial process' until 'a jury returns a guilty verdict,'" *id.* ¶ 25 (quoting *Martinez v. Court of Appeal of Cal., Fourth App. Dist.*, 528 U.S. 152, 162 (2000)). We also acknowledged that "[b]ased on similar principles," courts in a number of other jurisdictions have deemed "statements like the one at issue" here to be "impermissible." *Id.* (compiling cases). And Smith has identified two additional cases to add to that list. *See United States v. Starks*, 34 F.4th 1142, 1158–59 (10th Cir. 2022) (concluding that it was plain error for the trial court to allow the prosecution's statements during closing that the presumption of innocence was "'no longer true'" and "'ha[d] been changed'" to "stand uncorrected before the jury"); *Mahorney v. Wallman*, 917 F.2d 469, 471, 474 (10th Cir. 1990) (per curiam) (reversing a conviction based on the prosecutor's comments during closing arguments that the presumption of innocence "no longer exist[ed]" and "ha[d] been removed").

¶76 At the same time, however, we observed in *Harris* that while the cited Utah appellate cases "addressed the presumption of innocence generally," "no Utah appellate case has addressed the more particular question of whether a prosecutor can make . . . a statement [like the one at issue here] in closing argument." 2024 UT App 191, ¶ 26. We also noted that "the Utah Code states that the presumption of innocence applies 'until each element of the offense charged against [the defendant] is *proved* beyond a reasonable doubt,'" perhaps "suggest[ing] that the question turns on whether the State has presented sufficient *proof*, as opposed to whether the defendant has been *convicted*." *Id.* (quoting Utah Code § 76-1-501(1) (first alteration in original)). We then identified "several cases from other jurisdictions in which courts [have] held that a prosecutor does have leeway to argue in closing argument that the defendant should no longer be presumed innocent because the evidence presented at trial had . . . proven the defendant's guilt beyond a reasonable doubt." *Id.* (citing cases).

¶77 Ultimately, we concluded in *Harris* that defense counsel there "could have reasonably believed that if he had objected, the district court might [have] overrule[d] the proposed objection on legal grounds" due to "the legal uncertainty attendant to this question" and, therefore, that defense counsel's "decision to refrain from objecting . . . was not objectively unreasonable." *Id.* ¶¶ 30–31. The instant case is indistinguishable from *Harris* on this point, and we reach the same conclusion here. Counsel's decision not to object to the prosecutor's statement that the presumption of innocence was "gone" did not constitute deficient performance.

¶78 In *Harris*, we found the foregoing conclusion to be bolstered by the fact that during his own closing argument, defense counsel had read the court's presumption of innocence instruction and reminded the jury that the "'presumption persists unless the prosecution's evidence convinces you beyond a reasonable doubt that the defendant is guilty.'" *Id.* ¶ 33. And

Counsel did the same thing here. He likewise read to the jury from the court's instruction on the presumption of innocence and then explained, "Smith is still innocent as he sits here today. The presumption of innocence benefits the defendant throughout the trial unless the [State] meets [its] burden." Because the cases are, again, indistinguishable, we again adopt *Harris*'s conclusion:

> Given the uncertainty in the law discussed above, Counsel could reasonably think that this was the optimal approach, because approaching the problem this way allowed Counsel to remind jurors of the presumption of innocence without the potential exposure that would come if an objection to the prosecutor's statement was overruled in front of the jury.

*Id.*

¶79 In sum, Counsel did not perform deficiently by not objecting to the prosecutor's statement about the presumption of innocence being "gone," and Smith's ineffective assistance claim based on that statement fails.

F. Suppression of the Knife

¶80 Smith's final ineffective assistance claim is that Counsel should have sought to suppress the knife, alleging it was the fruit of an unlawful search in violation of the Fourth Amendment. However, even if we assume, without deciding, that Counsel performed deficiently by not seeking to suppress the knife, we conclude that Smith was not harmed by its admission. *See generally Honie v. State*, 2014 UT 19, ¶ 31, 342 P.3d 182 ("Because failure to establish either prong of the test is fatal to an ineffective assistance of counsel claim, we are free to address [such] claims under either prong.").

¶81 To establish that Counsel's performance prejudiced him, it "is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding" because "virtually every act or omission of counsel would meet that test." *Strickland v. Washington*, 466 U.S. 668, 693 (1984) (cleaned up). Instead, "a court must consider the totality of the evidence before the judge or jury and then ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors." *State v. Garcia*, 2017 UT 53, ¶ 42, 424 P.3d 171 (cleaned up). And in the context of the Fourth Amendment, a defendant must show "that there is a reasonable probability that the verdict would have been different absent the excludable evidence in order to demonstrate actual prejudice." *Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986).

¶82 Here, Smith cannot establish a reasonable probability of a different outcome had the knife been successfully excluded. In the overall evidentiary picture, the knife does not occupy a central role. Even without the knife's admission, the State's case would have remained strong, as it was supported by the following robust evidence: (1) Maddison's testimony about the rape; (2) Scott's testimony that he was outside the locked apartment during the incident, witnessed Smith leaving, and then immediately heard Maddison recount the incident while "crying hysterically"; (3) forensic evidence indicating the presence of sperm on Maddison's cervix; (4) DNA evidence linking that sperm to Smith; and (5) Smith's insistence to Detective that he did not have sex with Maddison and that there was "no way" his DNA would be found on her, which, in light of the later DNA evidence, likely rendered Smith wholly incredible. Excluding the knife from the trial would not have significantly altered "the evidentiary landscape in a way that had a reasonable probability of affecting the outcome of the trial." *State v. Nunes*, 2020 UT App 145, ¶ 25, 476 P.3d 172.

¶83 Because Smith has failed to demonstrate prejudice, this final claim of ineffective assistance is also unavailing.

### III. Cumulative Error

¶84 As to Smith's claim of cumulative error, we have held elsewhere that "the cumulative error doctrine . . . does not apply" when there is "no other error with which to cumulate [t]rial [c]ounsel's [non-prejudicial] presumed . . . errors." *State v. Torres-Orellana*, 2021 UT App 74, ¶ 30 n.11, 493 P.3d 711. Here, we have concluded that the district court did not err by denying Smith's motion to dismiss and that, as to five out of six of Smith's ineffective assistance claims, Counsel did not perform deficiently. As to Smith's last ineffective assistance claim, we determined that Counsel's assertedly deficient performance did not prejudice Smith. Because there is no error to accumulate with the last ineffective assistance claim, the cumulative error doctrine does not apply. *See id.*

### CONCLUSION

¶85 The district court did not err in denying Smith's motion to dismiss on due process grounds. On his claims of ineffective assistance of counsel, Smith has either not shown deficient performance or not shown prejudice resulting from Counsel's assertedly deficient performance. And Smith's claim of cumulative error is likewise unavailing. We therefore affirm Smith's conviction.

————————